**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MAHMOUD O. ALILI,

        Plaintiff,

                          Case No. 1:25-cv-634

    v.

                          **JUDGE DOUGLAS R. COLE**

BLOCK INC., et al.,           **Magistrate Judge Bowman**

        Defendants.

## OPINION AND ORDER

Defendants Block, Inc., and PayPal Holdings, Inc., move this Court either for dismissal (Block) or an order compelling arbitration (Block and PayPal). (Block's Mot. to Dismiss or Compel Arb., Doc. 15; PayPal's Mot. to Compel Arbitration, Doc. 17). For the reasons explained below, the Court **GRANTS** both motions and sends the parties to arbitration.

## BACKGROUND

Alili initiated this case on August 29, 2025. (Compl., Doc. 1). The first complaint, which named only Block as a Defendant, alleged that Block unlawfully "de-banked" Alili "in direct violation of the executive order signed August 7th, 2025." (*Id.* at #1). The latter apparently refers to Executive Order 14331, Guaranteeing Fair Banking for All Americans, 90 Fed. Reg. 38925. Alili suggested that Block's proffered reason for the closure of the accounts was illegitimate—an "unlawful justification based on [an] act not of the account holder but rather a third party." (Doc. 1, #1). Alili also alleged that Block's actions were motivated by religious and racial animus. (*Id.*). In terms of relief, Alili sought $100,000 in compensatory damages and $1,200,000 in

punitive damages, as well as "restoration of accounts" and "further monitoring of Block." (*Id.*).

After the return of an unexecuted summons, (Doc. 4), Alili moved to amend his complaint, (Doc. 5). The Magistrate Judge determined that leave of the Court was not yet required. So she denied Alili's motion as moot and instead permitted him to file his amended complaint as a matter of course. (12/2/25 Not. Order). Alili did so shortly thereafter. (Doc. 6).

Alili's new pleading shares some particulars with his first complaint—namely, the allegations surrounding the termination of Alili's accounts—but differs with respect to others. For one, Alili names PayPal Holdings, Inc., as a new Defendant. (*Id.* at #10). For another, the amended complaint clarifies that Alili's claims are premised on alleged violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq., the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 et seq., and the Fair Credit Billing Act (FCBA), 15 U.S.C. § 1666 et seq. (Doc. 6, #10).

The amended complaint also adds a new set of assertions in which Alili expands on the third-party fraud allegations from his first complaint. He specifies that someone opened a fraudulent account with FORA Financial, LLC, in his name, an assertion that he says finds support in prior rounds of litigation with various Credit Reporting Agencies (CRAs). (*Id.*). But while he relies on those earlier suits, he provides no citations for, or further information about, them.[1] (*Id.*). As the Court

---

[1] Alili does, however, intimate that FORA Financial obtained a default judgment against him in New York state court. (Doc. 6, #10–11).

reads the amended complaint, Defendants allegedly terminated Alili's Cash App and PayPal accounts based on the existence of the fraudulent FORA Financial account. (*Id.*). Alili implies that these terminations were wrongful because Defendants failed to investigate the supposed fraud, even after Alili notified them of the account's allegedly fraudulent origin. (*Id.* at #10–11).

Alili's amendment also upped the ante on his requested relief. While Alili has opted to stick with his $100,000 compensatory damages request and his various nonmonetary requests, he now seeks $5,000,000 in punitive damages. (*Id.* at #11).

After some back and forth regarding Defendants' deadlines to move or plead, (*see* Doc. 11; 1/12/26 Not. Order; Doc. 14; 1/13/26 Not. Order), Defendants filed the instant motions, (Doc. 15; Doc. 17). Block argues that (1) Block's terms of service bar Alili's claims; (2) Alili's allegations do not pass muster under Federal Rule of Civil Procedure 12(b)(6); (3) venue lies in California, rather than Ohio; and (4) a mandatory arbitration provision covers Alili's claims. (Doc. 15-1, #43–54). PayPal, meanwhile, trains its analysis solely on that last option—compulsory arbitration. (Doc. 17-1, #300–04).

Alili elected not to respond to either motion by the time the rules set forth. So, on March 6, 2026, after his deadline to respond to the Block motion had passed, the Magistrate Judge issued an order to show cause, in which she required Alili to explain why Block's Motion to Dismiss (Doc. 15) should not be construed as unopposed. (Doc. 19). And just over four months later, Alili has yet to respond to either motion. So the matter is ripe for review.

### LEGAL STANDARD

PayPal's sole request for relief is an order compelling arbitration. Block, on the other hand, seeks various forms of relief, including dismissal under Rule 12(b)(6), in addition to, or instead of, an arbitration order. The legal standard that matters, though, is principally the one relating to review of motions to compel arbitration. That is because the Court starts, and largely ends, its analysis with Defendants' shared request—that the Court send this matter to arbitration. The Court starts there because arbitrability is a "gateway" issue, meaning courts should address "the arbitrability of the plaintiff's claim *at the outset* of the litigation." *Southard v. Newcomb Oil Co., LLC*, No. 19-5187, 2019 WL 8111958, at *4 (6th Cir. Nov. 12, 2019) (emphasis in original) (citation omitted). Thus, "motions to compel arbitration must be resolved before the resolution of any other motion." *Id.* at *5; *see also Dahdah v. Rocket Mortg., LLC*, No. 22-11863, 2023 WL 11944898, at *1–2 (E.D. Mich. Nov. 17, 2023) (granting motion for reconsideration where the court had granted a motion to dismiss before considering a motion to compel arbitration), *rev'd on other grounds*, 166 F.4th 556 (6th Cir. 2026). And the Court ends there because it concludes that arbitration is warranted.

In deciding whether to compel arbitration, the Court begins with the Federal Arbitration Act's (FAA) command that "[a] written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Because "'arbitration is a matter of contract' … 'courts must rigorously enforce arbitration agreements according to their terms.'" *In re*

*StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 878 (6th Cir. 2021) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)).

Consistent with that, the FAA "allows a party to an arbitration agreement to petition a federal court for enforcement." *Memmer v. United Wholesale Mortg.*, 135 F.4th 398, 404 (6th Cir. 2025) (citing 9 U.S.C. § 4). But before granting a motion to compel arbitration, the Court must conclude "that (1) the parties agreed to arbitrate; (2) the claims asserted fall within the scope of the arbitration agreement; and (3) Congress did not intend for those claims to be non-arbitrable." *Id.* (citing *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003)). So those are the issues the Court addresses below.

## LAW AND ANALYSIS

### A.    Choice of Law.

Before turning to the motion-to-compel analysis, though, the Court pauses to briefly address an antecedent issue: choice of law. That's because the first two prongs of that analysis—formation and scope—are "presumptively questions of state law governed by the relevant state's contract law." *AtriCure, Inc. v. Meng*, 12 F.4th 516, 522 (6th Cir. 2021) (cleaned up) (citations omitted).

Here, the case involves two separate agreements governed by separate bodies of contract law. The first agreement, arising from Alili's assent to Block's terms of service, contains a choice-of-law provision that specifies California law. (Doc. 15-3,

#151 (2022 terms of service); Doc. 15-4, #288 (2024 terms of service)).[2] As a result, Block argues that California law governs its dispute with Alili. (Doc. 15-1, #44–45 n.2). The PayPal agreement, by contrast, selects Delaware law. (Doc. 17-2, #381 (2020 user agreement); *id.* at #446 (2021 user agreement)).[3] And so PayPal says that its dispute with Alili is governed by Delaware law. (Doc. 17-1, #301 n.3).

But the Court is not altogether convinced that those provisions control. Admittedly, the Defendants' argument is not entirely without support. *See, e.g.*, *Memmer*, 135 F.4th at 404 (applying Michigan law to the analysis based on contractual choice-of-law provision). At the same time, though, giving effect to the choice-of-law provisions while analyzing whether the parties in fact formed a contract would "presume as valid the very agreement in dispute." *Page v. GameStop Corp.*, No. 24-3428, 2025 WL 637441, at *2 (6th Cir. Feb. 27, 2025). Fortunately, however, the Court can sidestep here what otherwise might have been a thorny choice-of-law analysis. Both Defendants' motions are unopposed, and both apply either California or Delaware law (respectively) throughout. (*See* Doc. 15-1; Doc. 17-1). The *unopposed* part of that matters—courts "regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid

---

[2] Alili created several Cash App accounts from 2020 through 2024. (*See* Reyes Decl., Doc. 15-2, #59 & n.1). Block has provided copies of Cash App's terms of service as of May 22, 2022, (Doc. 15-3), and February 7, 2024, (Doc. 15-4). "While certain visual elements, such as font size or color, may differ slightly, all material content, including the fields and text, remain unchanged and accurately reflect the information that was displayed to Alili." (Doc. 15-2, #62).

[3] Alili opened two PayPal accounts—one on September 11, 2020, and another on May 14, 2021. (Psota Decl., Doc. 17-2, #308). The choice-of-law provisions in the 2020 and 2021 versions of the user agreement are identical. (*Compare id.* at #381, *with id.* at #446).

deciding what could be knotty choice-of-law questions." *Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) (collecting cases). So, given the lack of any live dispute about the governing law, the Court applies the law of the state each Defendant requests in their briefing, but does so "without resolving any choice-of-law questions." *AtriCure*, 12 F.4th at 525 (citing *Masco Corp.*, 795 F. App'x at 427).

**B.      Alili Has Formed Agreements to Arbitrate with Defendants.**

With the governing law settled, consider formation. The Court analyzes Alili's agreements with Block and PayPal in turn.

**1.      Alili Has Formed an Agreement to Abitrate with Block.**

The Court applies California law to the Block agreement, and "[u]nder California law the basic requirements for an enforceable contract are (1) parties capable of contracting, (2) the consent of those parties, (3) a lawful object, and (4) adequate consideration." *Santana v. Studebaker Health Care Ctr., LLC*, 343 Cal. Rptr. 3d 480, 488 (Cal. Ct. App. 2026) (citations omitted). Each element is satisfied here.

*First*, California law provides that "[a]ll persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." Cal. Civ. Code § 1556. And there is no suggestion that those exempted categories extend to either Alili or Block. So the parties had the capacity to form the agreement.

*Second*, Alili consented to Block's terms of service when he opened accounts on Block's Cash App application on September 7, 2020, July 23, 2022, June 20, 2024, and September 19, 2024. (Doc. 15-2, #58–60 & n.1). Opening these accounts required

Alili to click a "Next" button. (*Id.* at #59). And before Alili proceeded to do so, he was informed that, "[b]y entering and tapping Next, you agree to the [hyperlinked] Terms, E-Sign Consent, & Privacy Notice." (*Id.*).

California has a well-developed taxonomy for contracts allegedly formed over the internet. Such contracts "are classified by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025) (internal quotation marks omitted) (citing *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024)); *see also Dahdah v. Rocket Mortg.*, 166 F.4th 556, 566–76 (6th Cir. 2026) (explaining these distinctions at length). "Here, a link to the Terms of Service was provided to [Alili] but [he was] not required to separately indicate that [he] had read or agree[d] with those terms before using [Block's] services." *Id.* So the Court employs the "inquiry-notice 'sign-in wrap' analytical framework." *Godun*, 135 F.4th at 708–09 (citation omitted). Under that framework, "contracts are formed between website users and operators only where '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Id.* at 709 (citations omitted).

Whether a notice is "reasonably conspicuous" turns on whether it is (1) "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and (2) the "full context of the

transaction, such as whether the type of transaction contemplates entering into a continuing, forward-looking relationship that would be governed by terms and conditions." *Id.* at 709–10 (cleaned up). "A hefty dose of common sense goes a long way" in analyzing those two considerations. *Id.* at 710. Whether a consumer has put forth an "unambiguous manifestation of assent" turns on whether the consumer was "explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* (emphasis and citations omitted).

Here, the notice screen that Alili confronted upon signing up for Block's services largely speaks for itself:





9

(Doc. 15-2, #60). While the notice text is smaller than the other text on the screen, it is sandwiched near the center of the screen between the "Next" button that Alili needed to click to proceed, and the field in which he would have typed his phone number. The gray-on-white presentation of the text favors a finding of conspicuousness. *Cf. Godun*, 135 F.4th at 712 ("Th[e] gray-on-gray presentation also suggests that the advisal is inconspicuous."). And the context of the transaction suggests an ongoing or forward-looking relationship because Cash App is a smartphone application, which suggests ongoing use governed by terms of service. *See Keebaugh*, 100 F.4th at 1020 ("An app is different from a typical one-and-done interaction between the user and a traditional website—the app's presence on the phone until deleted carries the connotation that the user will also have ongoing access to that app unless something material changes."). So looking at the notice with a "hefty dose of common sense," it was "reasonably conspicuous." *Godun*, 135 F.4th at 709–10.

Additionally, Alili "unambiguously" manifested consent to the reasonably noticed terms of service. *Id.* That's because the notice states that the user agrees to be bound by "tapping Next," (Doc. 15-2, #60), and thereby "explicitly notif[ies] [the] user of the legal significance of the action [he] must take to enter into a contractual agreement," *Berman v. Freedom Fin. Network*, 30 F.4th 849, 858 (9th Cir. 2022). So the second element of formation—consent—is satisfied.

*Third*, Alili's agreement with Block clearly had a "lawful object." *Santana*, 343 Cal. Rptr. 3d at 488. "The object of a contract is the thing which it is agreed, on the

10

part of the party receiving the consideration, to do or not to do." *VFLA Eventco, LLC v. William Morris Endeavor Ent., LLC*, 318 Cal. Rptr. 3d 844, 863 (Cal. Ct. App. 2024) (quoting Cal. Civ. Code § 1595). Neither party to this contract agreed "to do or not to do" something unlawful. *Id.* So this requirement is met.

*Fourth*, there was "adequate consideration" for Alili's agreement with Block. In exchange for access to Block's Cash App application, Alili agreed to be bound by Block's terms of service. That's enough. *See* Cal. Civ. Code. § 1605 ("Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.").

In short, each of California's elements for contract formation are met here, so Alili has agreed to be bound by Block's terms of service. And because those terms include an arbitration provision, (*see* Doc. 15-3, #143–51; Doc. 15-4, #276–88), Alili has agreed to arbitrate this dispute *if* the dispute falls within the scope of the arbitration provision—a question to which the Court turns shortly.[4]

---

[4] Though he has not raised the argument (or indeed any argument), Alili could not resist this conclusion merely because this is a "container" contract—i.e., a broader contractual agreement of which the arbitration provision is but one part. Generally, a party "cannot be excused from complying with the arbitration provision if [he] simply failed to read the contract." *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1016 (6th Cir. 2003) (citations omitted). So even if Alili had argued, for example, that he did not read the arbitration provision, that fact would not change the analysis.

11

### 2.     Alili Has Formed an Agreement to Arbitrate with PayPal, too.

Next up is Alili's agreement with PayPal. Here, too, Alili has assented to a contract that contains a mandatory arbitration provision. Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

*First*, Delaware contract law has not developed quite the same label-driven, category-specific approach to internet contracts as California. Instead, Delaware broadly distinguishes between "browsewrap" agreements, which are generally "impermissible," and "clickwrap" agreements, which "are routinely recognized by courts and are enforceable under Delaware law." *Doe v. Massage Envy Franchising, LLC*, No. S20C-05-025, 2020 WL 7624622, at *3 (Del. Super. Ct. Dec. 21, 2020).

Here, Alili opened two PayPal accounts—one on September 11, 2020, and another on May 14, 2021. (Psota Decl., Doc. 17-2, #308). When Alili opened both accounts, he checked a box "next to text that provided: 'You have also read and agree to the User Agreement and Privacy Statement.'" (*Id.* (emphasis omitted)) "The words 'User Agreement' were a hyperlink set forth in bolded, bright blue font that, if clicked, would immediately present the user with the User Agreement's full text." (*Id.* (emphasis omitted)). Further, Alili needed to click an "Agree and Create Account" button to proceed. (*Id.*). So Alili's screen would have looked like this:

12



(*Id.* at #309). Just like the Block agreement, PayPal's user agreement contains an arbitration provision. (*Id.* at #437–38). The provision says in pertinent part that "[Alili] and PayPal each agree that any and all disputes or claims that have arisen or may arise between [Alili] and PayPal … shall be resolved exclusively through final and binding arbitration." (*Id.* at #438).

As the Northern District of California held when analyzing this very agreement, "the arbitration agreement is part of a valid clickwrap agreement under Delaware law." *Cheng v. PayPal, Inc.*, No. 21-cv-3608, 2022 WL 126305, at *3 (N.D. Cal. Jan. 13, 2022). The Court agrees not only with the Northern District's result, but also its reasoning. "[Alili] was required to click *two* items indicating his assent to the

13

[user agreement]," which is sufficient to establish a "valid clickwrap agreement containing an arbitration clause."[5] *Id.* (emphasis in original).

*Second*, the contract terms are "sufficiently definite." *Osborn*, 991 A.2d at 1158. On this point, Delaware follows the Restatement (Second) of Contracts, "which suggests that terms are sufficiently definite if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) (internal quotation marks and citation omitted). Thus, "[a] contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do." *Id.* Here, what the parties "agreed to do" is clear, at least for purposes of this dispute: PayPal offered its services in exchange for Alili's assent to be bound by PayPal's user agreement.

*Third*, there is "legal consideration" for basically the same reason—the service-for-promise structure of the agreement constitutes bargained-for consideration. *Osborn*, 991 A.2d at 1158.

So again, an agreement with an embedded arbitration provision exists between Alili and PayPal.

---

[5] The Northern District qualified this language with the adverb "presumptively," but that is only because the plaintiff in *Cheng* argued unconscionability. *See* 2022 WL 126305, at *3–5. Alili, who would have borne the burden of establishing unconscionability in this case, *see, e.g.*, *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 365 (6th Cir. 2014) (citation omitted), did not respond to either of the motions before the Court. Even if he had, though, the argument likely would have failed under Delaware law for the reasons the *Cheng* court explained. *See* 2022 WL 126305, at *3–5.

**C.      Alili's Claims Fall Within the Scope of the Arbitration Agreements.**

With the existence of the Block and PayPal agreements settled, the Court considers another question: what kinds of disputes do the agreements cover? Each agreement answers with plain text: "any and all disputes."[6] (Doc. 15-3, #143; Doc. 15-4, #276 (capitalization omitted); Doc. 17-2, #371, 438). Both California and Delaware contract law give effect to these terms in their ordinary signification. *See Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 146 (Cal. Ct. App. 1994) ("We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made." (citation omitted)); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017) ("Because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party." (cleaned up)). And the same rule applied to the same language yields the same conclusion: the general terms "any" and "all" are broad enough to sweep in this dispute.

**D.      Congress Did Not Intend for Claims Like Alili's to Be Non-Arbitrable.**

Finally, the Court considers whether Congress intended for Alili's claims to be non-arbitrable. *Memmer*, 135 F.4th at 404 (citing *Fazio*, 340 F.3d at 392). In short, the answer is no. Courts have roundly recognized that Congress fully intended for the FAA to cover FCBA, FCRA, and ECOA claims. *See, e.g., Nykoriak v. Experian Info.*

---

[6] Subject to some exceptions not relevant here. (*See* Doc. 15-3, #143; Doc. 15-4, #276; Doc. 17-2, #371, 438).

*Sols., LLC*, No. 21-cv-12227, 2022 WL 4455548, at \*4 (E.D. Mich. Sep. 23, 2022) (FCBA and FCRA claims); *Ahmed v. Citibank, N.A.*, No. 19-cv-4439, 2020 WL 2988666, at \*8 (E.D.N.Y. June 2, 2020) (ECOA claims).

\*    \*    \*

Alili's claims must proceed to arbitration. The only question that remains is whether the appropriate course for this suit in the interim is dismissal or a stay. Though neither party notes it, the Supreme Court recently answered that question in an opinion that controls here, holding that § 3 of the FAA mandates a stay when a party requests one. *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024) ("When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss."). Here, while both Defendants seem to principally seek dismissal, what they actually requested was a dismissal or a stay. (Doc. 15-1, #50; Doc. 17-1, #304).

One might be tempted to conclude that, where Defendants seek a stay only as an alternative to dismissal, a dismissal is still a permissible course. But as the Court reads FAA § 3 and *Smith*, that is not the case. The statute provides that the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. While Defendants' stay requests might seek that relief in the alternative, they are nonetheless "application[s]" for a "stay." *Id.* And as the Supreme Court stated with regard to § 3 itself, "the use of the word 'shall' creates an obligation

16

impervious to judicial discretion.'" *Smith*, 601 U.S. at 476 (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).

Statutory structure lends support to the same conclusion. "When a court denies a request for arbitration, § 16 of the FAA authorizes an immediate interlocutory appeal." *Id.* at 477–78 (citing 9 U.S.C. § 16(a)(1)(C)). "[B]y contrast, Congress made clear that, absent certification of a controlling question of law by the district court under 28 U.S.C. § 1292(b), the order compelling arbitration is not immediately appealable." *Id.* at 478 (citing 9 U.S.C. § 16(b)). As the Supreme Court recognized, dismissal would undercut the pro-arbitration thrust of these sections, *id.*, as it would allow immediate appeal of the order compelling arbitration,

Finally, "staying rather than dismissing a suit comports with the supervisory role that the FAA envisions for the courts." *Id.* That supervisory role may include, for example, "appointing an arbitrator," "enforcing subpoenas," and "facilitating recovery on an arbitral award." *Id.* (citing 9 U.S.C. §§ 5, 7, 9). In light of the role that Congress envisioned for the federal courts under the FAA, "[k]eeping the suit on the court's docket makes good sense." *Id.*

In sum, text and structure, as well as the judiciary's role within the overall statutory scheme, suggest that it is better to read *Smith* as covering Defendants' stay requests here. The Ninth Circuit has reached the same conclusion under similar circumstances. *See Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 711 (9th Cir. 2024) ("Since [*Smith*] made clear that a district court does not have discretion to dismiss the action when granting a motion to compel arbitration under 9 U.S.C. § 3,

17

the court is compelled to grant Cathay Pacific's alternative request for a stay."). The Court therefore **GRANTS** Defendants' motions but **STAYS** this matter pending arbitration and **DENIES** the rest of Block's requested relief as **MOOT**.[7]

## CONCLUSION

The Court **GRANTS** Block's Motion to Dismiss (Doc. 15), which the Court reads as an application for a stay for the reasons above, as well as PayPal's Motion to Compel (Doc. 17). Consistent with that, the Court **STAYS** this matter pending arbitration proceedings.

**SO ORDERED.**

July 13, 2026
 **DATE**

DOUGLAS R. COLE
UNITED STATES DISTRICT JUDGE

---

[7] Although *Smith* left open the possibility of dismissal "if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration," the Court concludes that it cannot, for instance, grant Block's request to dismiss under 12(b)(6). 601 U.S. at 476 n.2. The specific example that *Smith* provided was dismissal for lack of subject-matter jurisdiction. *Id.* That makes sense. Because Article III courts are of limited jurisdiction, they may "entertain an action brought under the FAA only if the action has an 'independent jurisdictional basis.'" *Badgerow v. Walters*, 596 U.S. 1, 8 (2022) (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)). So a court without such a basis would lack the authority to compel arbitration in the first place. But this same line of reasoning does not extend to a motion under Federal Rule of Civil Procedure 12(b)(6) once a court determines that a valid arbitration agreement covers a plaintiff's claims. Rule 12(b)(6) motions are directed at the merits of a dispute, which, in this context, the arbitrator must decide. The Court is not necessarily suggesting that the Supreme Court's remarks in *Smith* apply *only* to jurisdictional defects. But they have little bearing here.